IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brandywine Village Associates, LP   :
and L&R Partnership, LLC,   :
              Appellants   :
  :
  :
          v.   :
  :
East Brandywine Township Board of   :
Supervisors and Carlino East   :   No. 499 C.D. 2020
Brandywine, L.P.   :   Argued: March 15, 2021


BEFORE:   HONORABLE P. KEVIN BROBSON, President Judge
             HONORABLE ANNE E. COVEY, Judge (P.)
             HONORABLE MICHAEL H. WOJCIK, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                      FILED: July 20, 2021


        Brandywine Village Associates, LP (BVA) and L&R Partnership, LLC, (L&R) (collectively, Appellants) appeal from the Chester County Common Pleas Court's (trial court) April 16, 2020 order denying their appeal from the East Brandywine Township (Township) Board of Supervisors' (Board) determination that granted Carlino East Brandywine, L.P. (Developer) conditional approval of its Preliminary/Final Land Development Plan (2018 Plan). Appellants present five issues for this Court's review: (1) whether the Board erred or abused its discretion by approving Township Subdivision and Land Development Ordinance (SALDO) and Township Stormwater Ordinance waivers; (2) whether the Board disregarded relevant evidence and whether its decision is supported by substantial evidence; (3) whether the Board abused its discretion when it approved the 2018 Plan, which required the Board to grant waivers and where, pursuant to a contract with

Developer, the Township benefits from the approval by way of obtaining a Developer-built road and Developer provided indemnity; (4) whether the Township abused its discretion in propounding a decision mailed after BVA and L&R filed their appeal from the Board's order, and whether the trial court abused its discretion in refusing to strike it; and (5) whether the Township, the Board and the trial court impaired Appellants' due process rights where the Township and the Board, as party to a contract, benefitted from the 2018 Plan's approval requiring the granting of multiple waivers, and conducted the hearing on and sat as adjudicator of that same 2018 Plan, and where the trial court excluded a sworn affidavit alleging Township misconduct, refused to strike the decision, consolidated it with a properly filed appeal, and refused the record's supplementation designed to preserve issues for appellate review. After review, we affirm.

This action is the latest in a lengthy and complex dispute between Developer and Appellants regarding Developer's attempts to secure approvals to develop a shopping center that Appellants oppose. The parties have appealed several times to this Court and the Pennsylvania Superior Court, encompassing a significant litigation history. *See In re: Brandywine Vill. Assocs.* (Pa. Cmwlth. No. 1409 C.D. 2017, filed July 2, 2018) (*Brandywine III*); *Brandywine Vill. Assocs. v. E. Brandywine Twp. Bd. of Supervisors* (Pa. Cmwlth. No. 1149 C.D. 2017, filed April 19, 2018) (*Brandywine II*); *Brandywine Vill. Assocs. v. E. Brandywine Twp. Bd. of Supervisors* (Pa. Cmwlth. No. 164 C.D. 2017, filed January 5, 2018) (*Brandywine I*); *see also Carlino E. Brandywine v. Brandywine Vill. Assocs.* (Pa. Super. No. 3388 EDA 2017, filed October 16, 2018); *Carlino E. Brandywine, L.P. v. Brandywine Vill. Assocs. & Assocs. Wholesalers, Inc.* (Pa. Super. No. 2558 EDA 2013, filed October 20, 2014).

This Court, in *Brandywine II*, summarized the procedural history preceding the current application, as follows:

2

Developer is the equitable owner of an undeveloped tract of land located at 1279 Horseshoe Pike in East Brandywine Township, Chester County, Pennsylvania, containing approximately 10.118 acres (Property). The Property was originally part of a 21-acre parcel. BVA owns the remaining 11 acres, which contain a shopping center adjacent to the east side of the Property.

Prior to Developer's acquisition of the Property, BVA had certain rights to use the 10-acre parcel under a Cross Easement Agreement entered into with Developer's predecessor[-]in[-]title. Because the entire 21 acres did not have access to any public sewer, the Cross Easement Agreement provided that BVA would build, at its expense, a sewer plant for the use of both parties on the 10-acre parcel. The Cross Easement Agreement also granted BVA an easement to the 10-acre parcel for stormwater management as well as an access easement to use the 10-acre parcel as a main entrance to BVA's shopping center. L&R, the general partner of BVA, is the owner of an undeveloped parcel of land adjacent to the north side of the Property.

[]

Throughout this dispute, Developer has submitted numerous versions of land development plans pertaining to the Property, all of which have been opposed by [Appellants]. Although this matter was before us previously, we quashed that appeal because what we were being asked to provide was an advisory opinion. . . .

[]

Since 2010, Developer has submitted land development plans to build a 51,525[-]square-foot supermarket with a 9,250[-]square-foot expansion area, a 4,600[-]square-foot attached retail building, and a pad site for a 4,088[-]square-foot bank on the Property. From the beginning, the Township insisted that Developer provide and pay for the construction of a road (Connector Road) connecting the Property with Horseshoe Pike (Route 322) on which it fronts and North Guthriesville Road.

Because the Connector Road was to cross over L&R's adjoining property, in 2014, the Township and Developer

3

entered into a Memorandum of Understanding (MOU). Under this MOU, Developer, in lieu of paying a significant portion of the Township's transportation impact fee of $1,795,000[.00], was obligated to design, permit and construct at its expense the Connector Road and dedicate it to the Township. The MOU also provided that the Township would condemn necessary portions of L&R's adjoining property as well as BVA's easements on the Property granted under the Cross Easement Agreement.

[]

Although Developer has submitted several different versions of land development plans pertaining to the Property, there are two particular preliminary plans that have been subject to much litigation. The first of those plans was filed on December 9, 2014 (2014 Plan). Therein, Developer treated and identified the Connector Road as a 'driveway,' notwithstanding that it would eventually be dedicated to the Township as a public road. The 2014 Plan also included the area under the 'driveway' as part of Developer's land area. The 2014 Plan did not identify the previously condemned BVA easements on the Property.

In January 2015, the Board conditionally approved the 2014 Plan (Original 2015 Decision). [Appellants] appealed that decision on February 20, 2015 (2015 Appeal)[,] and Developer intervened.

[]

Before the trial court, [Appellant]s alleged, *inter alia*, that the 2014 Plan contained numerous defects[.]

. . . .

[Appellants] then filed a motion for an additional evidentiary hearing, which the trial court granted, remanding the matter to the Board to take additional evidence. The Board conducted five hearings during which [Appellants] presented additional evidence in opposition to the 2014 Plan. In September 2015, because the parties disagreed as to the parameters of the Board's obligation following the conclusion of the hearings, the trial court issued an order requiring the Board to consider

4

all evidence presented on remand and to make a decision based upon the entire record.

Then, in a decision dated October 1, 2015 (Revised 2015 Decision), the Board reversed the Original 2015 Decision granting conditional approval of the 2014 Plan. It did so because it found that the 2014 Plan was deficient in that it violated certain ordinance provisions dealing with street design, stormwater management and treatment of sewage effluent. The Board did not revisit other issues that [o]bjectors raised regarding the defects in the plan.

[]

Developer appealed the Revised 2015 Decision to the trial court. However, pursuant to a stipulation of the parties approved by the trial court, Developer withdrew that appeal and the parties agreed that they could raise all issues related thereto in the still-pending appeal of the Original 2015 Decision.

On October 22, 2015, Developer filed a new Preliminary/Final Land Development Plan (2015 Plan), which was substantially similar to its previous plans and, once again, included a Connector Road through Developer's [P]roperty and addressed the issues raised in the Revised 2015 Decision. The 2015 Plan was last revised on December 9, 2015.

The Board conditionally approved the 2015 Plan on April 20, 2016 (2016 Approval), subject to Developer providing an updated Traffic Impact Study for the proposed development and complying with any recommendations of the Township traffic engineer. As pertinent, the Board also granted a requested waiver of [Section] 350-47.B.2 of SALDO (sewage effluent requirements) and Section 350-40.N.2 of SALDO (radius requirements for non-residential driveways). The Board also determined that Developer [shall either comply with Section 350-36 of SALDO or request a waiver].

[Appellants] appealed, raising almost identical issues to those raised against the 2014 Plan. And, once again, the trial court sent the matter back to the Board, which then conducted three evidentiary hearings where [Appellants] presented substantially similar testimony.

5

. . . .

[]

While resolution of [Appellants'] appeal of the 2016 Approval was still pending, on January 6, 2017, the trial court issued an [o]pinion and [o]rder granting, in part, [Appellants'] appeal of the Original 2015 Decision. Notwithstanding, the trial court rejected numerous arguments offered by [Appellants] and made . . . findings [pertaining to setback requirement, minimum lot area, traffic, stormwater management, and sewage effluent.]

. . . .

[Appellants] appealed to this Court, arguing that the trial court erred in finding that: (1) Developer did not violate the front-yard setback requirement in the [East Brandywine Township Zoning Ordinance (]Zoning Ordinance[)]; (2) SALDO's requirement to set aside land for sewage effluent is not a zoning regulation by incorporation; and (3) Developer met its burden to establish that its 2014 Plan provided safe and efficient ingress and egress.

However, because [Appellants] were the prevailing party below, the Township requested for the appeal to be quashed because [Appellants] lacked standing to bring the appeal. In response, [Appellants] argued that they were aggrieved by the trial court's determinations because in any future appeals, [Appellants] will be estopped from raising issues the trial court decided against them.

Ultimately, [this Court] agreed with the Township and quashed [Appellants'] appeal for lack of standing. Rejecting [Appellants'] concern, we further explained, '**collateral estoppel will not apply to those determinations** because those purportedly adverse determinations against [Appellants], as the prevailing party, were not 'essential' to the judgment below.' *Brandywine* [*I*] (citing *Callowhill C*[*tr.*] *Assoc*[*s.*]*, LLC v. Zoning B*[*d.*] *of Adjustment*, 2 A.3d 802, 809 (Pa. Cmwlth. 2010)) (emphasis added). . . .

[]

6

Prior to our disposition of *Brandywine I*, the trial court issued an order dated July 18, 2017 (2017 Decision) denying [Appellants'] appeal of the 2016 Approval. And, of course, that decision, . . . construed the Original 2015 Decision as **denying** [Appellants'] appeal of the 2015 Approval, finding that any issue also raised by [Appellants] in the Original 2015 Decision **were barred by the doctrine of collateral estoppel**.

Notwithstanding, the trial court went on to resolve various issues on appeal. For instance, for the first time, [Appellants] challenged the Board's granting a waiver of: (1) Section 350-40.N.2 of SALDO, which requires that non-residential driveways have a minimum radius of 30 feet; and (2) Section 350-36 [of SALDO], which pertains to deceleration lanes. [Appellants] also reasserted their challenge to the waiver of a sewage effluent provision, contending that because Section 399-47.K of the Zoning Ordinance incorporates SALDO provision[s], the [Pennsylvania Municipalities Planning Code's (]MPC[)[1]] traditional zoning variance hardship standards apply rather than the waiver requirement within the MPC.

The trial court rejected each of [Appellants'] challenges. As pertinent, it found that waiver of Section 350-40.N.2 [of SALDO] (radius requirements for non-residential driveways) was proper because the credible testimony offered by both traffic experts established that 'literal enforcement of the radius requirement . . . would require shifting the Connector Road to the West, thereby reducing the separation of traffic signals on Route 322 . . . [] [and] would not improve Brandywine Center's access, which is fixed by the existing travel isles within that development.' (Trial Court Opinion dated July 18, 2015 at 25-26.) The trial court rejected [Appellants'] contention that waiver of Section 350-47.B.2 of SALDO (pertaining to sewage effluent) was not permitted because it was incorporated under the Zoning Ordinance. The trial court also found their challenge to the purported waiver of Section 350-36.B.3 [of SALDO] (pertaining to deceleration lanes) meritless because the Connector Road was not, in fact, a deceleration lane.

---

[1] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

*Brandywine II*, slip op. at 2-13 (citations and footnotes omitted).  The *Brandywine II* Court reversed the Board's 2015 Plan approval solely "because the Connector Road [was] a public road and the 2015 Plan [did] not provide the required 85-foot setback from its front lot line to the [bank] building it proposes to construct." *Brandywine II*, slip op. at 25.

On July 3, 2018, Developer filed the 2018 Plan seeking to develop the Property with a shopping center containing a total of 65,400 square feet of retail space and 350 off-street parking spaces, stormwater management facilities, access driveways and landscaping.  Developer proposed to build the Connector Road along the eastern portion of Developer's Property and the Township's 1.972-acre parcel that was formerly part of L&R's property, but which the Township condemned.  The Connector Road would connect Horseshoe Pike and North Guthriesville Road at a new intersection Developer is to construct and dedicate to the Township.  Developer also plans to construct improvements along Horseshoe Pike on a .069-acre portion of property BVA formerly owned but the Township acquired through condemnation.  Unlike the 2015 Plan, the 2018 Plan does not contain a bank pad, and modifies the Connector Road to comply with SALDO's street design requirements.  Apart from those changes, the 2018 Plan is substantially similar to the 2015 Plan.

Township engineer Nathan Cline (Cline), Township traffic engineer Andreas Heinrich (Heinrich), Township Municipal Authority (Municipal Authority) engineer Joseph Boldaz (Boldaz), the Township Planning Commission, the Township Historical Commission, and the Municipal Authority reviewed the 2018 Plan as a new land development submission without reference to prior Board or court decisions or Developer's prior plans.  *See* Bd. Dec. and Order at 47-48.  Relevant review letters indicate that the 2018 Plan satisfied the Township's Zoning Ordinance, SALDO, and the Stormwater Management Ordinance requirements,

8

with the exception of those requirements for which Developer sought waivers or modifications.

At Appellants' request, the Board held a hearing to consider the 2018 Plan.[2]  Chirag Thakkar (Thakkar), the proposed development's project engineer, testified on Developer's behalf.  Cline, Heinrich and Boldaz also presented testimony.  LTL Consultants, Inc.'s (LTL) municipal engineer Norman Ulrich (Ulrich) testified for Appellants.  On June 6, 2019, the Board approved an order granting conditional approval of the 2018 Plan (Approval Order).  On June 19, 2019, the Board issued a 96-page Decision and Order containing detailed findings of fact and conclusions of law in support of the Board's Approval Order (Decision).

Appellants appealed to the trial court.  On April 17, 2020, the trial court denied and dismissed the appeal.  Appellants appealed to this Court.[3]  On October 7, 2020, Appellants filed their brief with this Court.  On December 7, 2020, both Developer and the Board filed their briefs.  Notably, the Board therein argued that its Decision should be **reversed**, despite having argued to the trial court that its Decision should be affirmed.[4]  On December 15, 2020, Developer filed an Application to Strike the Board's Brief (Application to Strike) contending, *inter alia*, that the Board is judicially estopped from changing the position it took before the trial court.  On December 22 and 29, 2020, Appellants and the Board, respectively, filed answers to the Application to Strike.  On January 4, 2021, this Court ordered that the Application to Strike be listed for argument with the merits of the appeal.

---

[2] The hearing was held on December 12, 2018, and January 15 and 22, and February 21, 2019.

[3] "Where the trial court takes no additional evidence, appellate review in a land development appeal is limited to determining whether the local governing body committed an error of law or an abuse of discretion." *In re Provco Pinegood Sumneytown, LLC*, 216 A.3d 512, 517 n.6 (Pa. Cmwlth. 2019).

[4] The Board's new position was attributed to changes in the Board's composition.

## A. <u>Application to Strike the Board's Brief</u>

On March 12, 2021, this Court granted Developer's Application to Strike.[5] Developer contended in the Application to Strike that the Board's brief should be stricken because "the Board vigorously defended its approval of the 2018 Plan and advocated for the denial of BVA's appeal [in the proceedings before the trial court,]" Application to Strike at 4, ¶ 20, and, before this Court, the Board "incomprehensibly s[ought] to change the position of the Board and to adopt the position of [BVA,] in advocating for the reversal of the Board's own Decision." Application to Strike at 5, ¶ 27.

Developer raised three specific arguments in support of its position: (1) the doctrine of judicial estoppel prevents the Board from changing its position; (2) the Board may not seek reversal of its decision; and (3) the Board's brief is untimely because the Board is advocating a position consistent with BVA's.

With respect to judicial estoppel, this Court has explained:

> As a general rule, a party to an action is judicially estopped from assuming a position inconsistent with his or her assertion in a previous action if his or her contention was successfully maintained. The purpose of judicial estoppel is to uphold the integrity of the courts by preventing litigants from 'playing fast and loose' with the judicial system by changing positions to suit their legal needs. *Gross v. City of Pittsburgh*, 686 A.2d 864, 867 (Pa. Cmwlth. 1996). Judicial estoppel is unlike *res judicata* in that it depends on the relationship of a party to one or more tribunals, rather than on relationships between parties.

*Morris v. S. Coventry Twp. Bd. of Supervisors*, 898 A.2d 1213, 1218 (Pa. Cmwlth. 2006) (citation omitted).

> In *Black v. Labor Ready, Inc.*, 995 A.2d 875 (Pa. Super. 2010), the Pennsylvania Superior Court observed: 'Our

---

[5] Upon review of the parties' briefs, this Court granted the Application to Strike prior to oral argument on the merits.

10

Supreme Court has not definitively established whether the second element (successful maintenance) is strictly necessary to implicate judicial estoppel or is merely a factor favoring the application. *See* [*In re Adoption of*] *S.A.J.*, [838 A.2d 616 (Pa. 2003)].' *Black*, 995 A.2d at 878 n.8; *see also Westfield Ins. Co. v. Astra Foods, Inc.*, 134 A.3d 1045 (Pa. Super. 2016). Notwithstanding, the Pennsylvania Supreme Court in *S.A.J.* held that '**successfully maintained**' does not require an adjudication, but includes situations in which 'the individual who made inconsistent statements successfully **established** [**his**] **claim and reaped its reward** (i.e., payment of benefits).' *S.A.J.*, 838 A.2d at 622.

*Nagle v. Trueblue, Inc.*, 148 A.3d 946, 954 n.10 (Pa. Cmwlth. 2016) (emphasis added). "Judicial estoppel 'appl[ies] **with equal if not greater force when a party switches positions within the same action**.'" *Bienert v. Bienert*, 168 A.3d 248, 255 (Pa. Super. 2017) (emphasis added) (quoting *Ligon v. Middletown Area Sch. Dist.*, 584 A.2d 376, 380 (Pa. Cmwlth. 1990)). Further,

[j]udicial estoppel applies to sworn facts or judicial admissions, and to legal argument. *See Hosp*[.] *& Health Ass*[*'n*] *of P*[*a.*] *v. Commonwealth*, 77 A.3d 587, 596 n.9 (Pa. 2013) (holding that the Commonwealth is judicially estopped from arguing that it cannot comply with the remedy sought because it prevailed on the opposite contention in opposition to an earlier sought preliminary injunction). In *Gross . . .* , the city introduced evidence in a federal civil rights trial that the city later attempted to disprove in a state eminent domain action, and this Court held that the city could not introduce contradictory evidence in the state eminent domain proceedings simply because it better suited the city's own ends. In *Thompson v. Anderson*, 632 A.2d 1349 (Pa. Super. 1993), a plaintiff successfully maintained an action at arbitration based on the theory of injury by intentional act and was subsequently estopped from arguing in the same action that the injury occurred because of a defendant's negligence.

11

*Bradley Ctr. v. N. Strabane Twp*. (Pa. Cmwlth. No. 2028 C.D. 2016, filed February 12, 2018), slip op. at 7 (citation omitted).[6]

Here, the Board asserted in its answer opposing Developer's Application to Strike that judicial estoppel did not apply because it was not a party to the adjudication of Developer's application but, rather, was the governing body evaluating the application. This Court addressed a similar circumstance in *Morris*, wherein, a township board of supervisors approved a developer's subdivision and land development plan subject to conditions. Thereafter, a neighboring property owner (Objector) filed a land use appeal from the preliminary plan approval to the trial court. After the trial court affirmed the board's approval, Objector appealed to this Court which again affirmed. The developer then submitted its final subdivision plans to the board. Thereafter, the township's engineer reviewed the plans and the developer worked to address issues raised by the board and township engineer. The board granted approval subject to five conditions. Objector appealed from the final approval. The trial court remanded the case to the board to allow Objector to introduce documents and present argument, and directed the developer to produce evidence of compliance with one of the conditions. The board held the remand hearing and issued a letter affirming its earlier final plan approval. Therein, the board found that the developer had satisfied the condition, and imposed additional conditions, but those new conditions did not supersede the conditions contained in the initial final plan approval. The trial court held that the board properly issued conditional approval of the developer's plan.

Objector appealed to this Court, arguing that judicial estoppel barred the board from granting final approval since, in the litigation pertaining to the

_____

[6] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), unreported opinions are not binding precedent, but may be cited for their persuasive value.

12

preliminary plan approval, the developer represented that it would satisfy all conditions attached by the board and the township's SALDO requirements before final plan approval. Objector claimed that judicial estoppel precluded the board and the developer from contending that final approval was proper. This Court applied the judicial estoppel doctrine to the board, explaining:

> According to our Supreme Court, in order to determine if judicial estoppel was appropriately applied by the trial court in the present case, th[e] Court must address: (1) whether [the d]eveloper/[b]oard has assumed an 'inconsistent' position in this litigation from the prior litigation concerning preliminary plan approval[;] and (2) whether [the d]eveloper/[b]oard 'successfully maintained' the position it assumed in the preliminary plan approval litigation. *In re S.A.J.*, . . . 838 A.2d [at] 621 . . . .

*Morris*, 898 A.2d at 1219.

> The *Morris* Court stated:
>
> Because [the d]eveloper and the [b]oard were successful in the preliminary plan approval litigation, we will focus on prong one of the test to determine whether [the d]eveloper and the [b]oard assumed an inconsistent position in this litigation from the prior litigation concerning preliminary plan approval.
>
> In this case, [the d]eveloper and the [b]oard did not take inconsistent positions in the final plan approval litigation because they both did not argue that [the d]eveloper was no longer required to obtain the necessary state agency permits or approvals in order to receive final plan approval. To the contrary, [the d]eveloper and the [b]oard had been consistent throughout that the preliminary and final plan approval was conditioned upon [the d]eveloper receiving the necessary state agency permits. Because no one made any representation that all state permits would be in hand before final plan approval was sought or granted, Objector had not satisfied the first prong of the judicial estoppel test.

13

*Morris*, 898 A.2d at 1219. Thus, this Court has applied the doctrine of judicial estoppel to a township board of supervisors in a land development plan appeal.

In the instant matter, this Court in deciding Developer's Application to Strike first considered whether the Board "ha[d] assumed an 'inconsistent' position in this litigation" regarding its granting of waivers. *Morris*, 898 A.2d at 1219. The record was unclear as to whether the Board's position was inconsistent from that in prior litigation, given that the plans at issue differed. Notably, the instant 2018 Plan differed from the prior three plans, upon which the Board rendered decisions that were appealed. Each prior plan approval was appealed and the Board's approval was reversed. Further, it did not appear that the Board's numerous waivers were at issue in the condemnation action. The fact that the Board sought condemnation for the Connector Road did not translate to a position supporting the granting of numerous waivers for the land development project. Because each plan was different, the Board's position before this Court was not inconsistent from prior litigation involving the previous plans.

With respect to the current 2018 Plan and the instant proceedings, the Board's position before this Court **was** clearly inconsistent from its decision approving the 2018 Plan, and from the position the Board took in the trial court, where the Board opposed Appellants' appeal.[7] The Board prevailed in the trial court when its decision was affirmed. Given this Court's decision in *Morris*, wherein it applied the doctrine of judicial estoppel to a township board of supervisors in a land development plan appeal, and the recognition that "[j]udicial estoppel 'appl[ies] **with equal if not greater force** when a party switches positions **within the same action**[,]'" this Court concluded that judicial estoppel prohibited the Board from advocating a position contrary to that pursued before the trial court below. *Bienert*,

---

[7] According to the trial court docket, the Board filed a "Brief of [the Board] in Opposition to Land Use Appeal of [Appellants]" on September 13, 2019. Reproduced Record at 3a.

14

168 A.3d at 255 (emphasis added).  Accordingly, this Court was constrained to grant Developer's Application to Strike.[8]

## B. <u>Waiver of SALDO and Stormwater Ordinance Provisions</u>

Regarding their substantive issues, Appellants first contend that the Board erred when it "waive[d] compliance with 19 SALDO and Stormwater Ordinance sections, 13 of them [sic] substantive design requirements[,]" Appellants' Br. at 17, without evidence that "literal enforcement [of SALDO requirements would] exact undue hardship because of peculiar conditions pertaining to the land in question," as required by Section 512.1(a) of the MPC.  53 P.S. § 10512.1(a).[9] Specifically, Appellants claim that, although a SALDO waiver request need not be supported by the same evidence of hardship necessary for a variance, "hardship of some type regarding the land, not the Developer's desires, is required.  In <u>this</u> case on <u>this</u> land, no hardship of <u>any</u> kind exists at <u>any</u> level."  Appellants' Br. at 22.

Appellants assert:

The [] Property is a gently sloping completely vacant piece of ground, with <u>no</u> physical constraint of <u>any</u> kind.  The only improvements are the current access road for the BVA Shopping Center and related basin that Developer proposes to eliminate.  On the condemned L&R parcel, the only feature is an artificial pond, established by the Developer's own expert . . . to be man-made and not a riparian waterway ([Reproduced Record (R.R.) at] 222a-255a).

Appellants' Br. at 20.  According to Appellants, Developer's hardship results not from the land, but from Developer's false claim that the Township engineer **mandated** the Connector Road's specific location.

---

[8] Having found that judicial estoppel bars the Board from advocating a contrary position, the Court need not address Developer's other related arguments.

[9] Added by Section 40 of the Act of December 21, 1988, P.L. 1329.

Appellants further argue:

> Every waiver adverse to Appellants is based on the claims of [] Thakkar, . . . orally presented at the first hearing. He claimed that the Township '*insisted*' on the [C]onnector [R]oad; that the Township's traffic engineer '*dictated*' its design and location; and because of this Township mandate it is '*impossible*' to comply with the ordinances[,] thus requiring the waivers. []R.[R. at] 278a, 281a-282a, 298a, 319a-320a[]. This alleged 'Township dictate' and resulting '*impossibility*' underpins every adverse waiver granted.

Appellants' Br. at 22. Appellants contend that there was no Township dictate on the Connector Road's specific location. Rather, Developer designed the Connector Road to permit Developer to construct the shopping center to its preferred specifications, and Developer's need for the requested waivers arises therefrom, not from necessity. According to Appellants, expert Ulrich developed and presented to the Board an alternate plan demonstrating the feasibility of the project without the requested waivers (Alternate Plan).

> Section 512.1 of the MPC provides:
>
> (a) The governing body or the planning agency, if authorized to approve applications within [SALDO], may grant a modification of the requirements of one or more provisions **if the literal enforcement will exact undue hardship because of peculiar conditions pertaining to the land in question**, **provided that such modification will not be contrary to the public interest and that the purpose and intent of the ordinance is observed**.
>
> (b) All requests for a modification shall be in writing and shall accompany and be a part of the application for development. The request shall state in full the grounds and facts of unreasonableness or hardship on which the request is based, the provision or provisions of the ordinance involved and the minimum modification necessary.

16

(c) If approval power is reserved by the governing body, the request for modification may be referred to the planning agency for advisory comments.

(d) The governing body or the planning agency, as the case may be, shall keep a written record of all action on all requests for modifications.

53 P.S. § 10512.1 (emphasis added).

As stated in the Board's Decision,

Section 350-62 of SALDO provides:

> A. In any case in which an applicant demonstrates to the satisfaction of the Board that **strict application of any provisions of this chapter would be unreasonable and would cause unnecessary hardship** as applied to the proposed subdivision or land development, the Board may grant a modification of such provision so as to grant relief from the unnecessary hardship. Any such modification granted shall be the least modification necessary to grant relief from the unnecessary hardship and shall be applied so that substantial justice may be done and the public interest secured; provided, however, that such modification shall not be granted if it would have the effect of nullifying the intent and purpose of this chapter.
>
> B. In granting modifications, the Board may impose such conditions as will, in its judgment, secure substantially the objectives of the standards and requirements so modified.

The Township Stormwater Ordinance also allows the Board to grant waivers pursuant to Section 345-110 which provides as follows:

> A. The requirements of this chapter are essential and shall be strictly adhered to. For any regulated activity where, after a close

17

evaluation of alternative site designs, it proves to be impracticable to meet any one or more of the mandatory minimum standards of this chapter on the site, the Township may approve measures other than those in this chapter, subject to [Section] 345-111[.]B and C [of the Township Stormwater Ordinance].

B. The governing body shall have the authority to waive or modify the requirements of one or more provisions of this chapter **if the literal enforcement will exact undue hardship because of peculiar conditions pertaining to the land in question**, **provided that such modification will not be contrary to the public interest and that the purpose and intent of this chapter is observed**. Cost or financial burden shall not be considered a hardship. **Modification may also be considered if an alternative standard or approach can be demonstrated to provide equal or better achievement of the results intended by this chapter**. A request for modification shall be in writing and accompany the . . . site plan submission. The request shall state in full the grounds and facts on which the request is based, provision or provisions of the chapter involved and the modification necessary.

C. For any proposed regulated activity involving earth disturbance equal to or greater than one acre, the Township may approve measures for minimum volume and infiltration control other than those required in this chapter only after consultation with and evaluation by [the Pennsylvania Department of Environmental Protection (Pa. DEP)] that the alternate site design meets state water quality requirements and does not conflict with state law, including, but not limited to, the Pennsylvania Clean Streams Law, [Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§ 691.1 - 691.1001].

Board Dec. at 52-53 (emphasis added).

This Court has explained that "Section 512.1 [of the MPC] clearly vests discretion with the Township to grant or deny any and all of the waivers requested in [a land development p]lan." *Miravich v. Twp. of Exeter, Berks Cnty.*, 54 A.3d 106, 114 (Pa. Cmwlth. 2012).

> Further, this Court [has] observed:
>
> > [T]he power to grant [SALDO] waivers resides with the supervisors, who may relax [SALDO] standards upon proof less rigorous than that required in order to obtain a variance from the [z]oning [h]earing [b]oard. *See Valenti* [*v. Wash. Twp.*, 737 A.2d 346, 349 (Pa. Cmwlth. 1999)] ('township may grant waivers which it deems appropriate in the interests of the township'). . . .
>
> *Telvil Constr. Corp. v. Zoning Hearing Bd. of E. Pikeland Twp.*, 896 A.2d 651, 656 (Pa. Cmwlth. 2006) (footnote omitted). 'Moreover, we have held that a waiver is proper where an additional requirement would offer little or no additional benefit and where literal enforcement would frustrate the effect of improvements.' *Tioga Pres. Grp. v. Tioga Cnty. Planning Comm'n*, 970 A.2d 1200, 1205 (Pa. Cmwlth. 2009); *see also Monroe Meadows Hous*[.] *P'ship, LP v. Mun. Council of Mun*[.] *of Monroeville*, 926 A.2d 548, 553 (Pa. Cmwlth. 2007) ('**a waiver** [**is**] **proper where a development offers a substantial equivalent to a subdivision requirement**, **where an additional requirement would offer little or no additional benefit**, **and where literal enforcement of a requirement would frustrate the effect of improvements**.'); *see also Levin v. Twp. of Radnor*, 681 A.2d 860 (Pa. Cmwlth. 1996). Also, '[i]t is well settled that, in the case where a developer cannot meet all the conditions of the subdivision ordinance, a township may grant waivers which it deems appropriate in the interest of the township.' *Valenti*, 737 A.2d at 349.

19

*Whitehall Manor, Inc. v. Plan. Comm'n*, 79 A.3d 720, 735-36 (Pa. Cmwlth. 2013) (emphasis added). Accordingly, waivers must meet Section 512.1 of the MPC's undue hardship standard or the standard set forth in *Monroe Meadows*. *See Tioga*.

The Board relied extensively on Thakkar's detailed testimony addressing each requested waiver. Thakkar admitted that the Connector Road's location dictated the need for many of the requested waivers. *See, e.g.*, R.R. at 277a, Notes of Testimony (N.T.) at 88; R.R. at 278a, N.T. at 89; R.R. at 282a, N.T. at 105; R.R. at 282a, N.T. at 107; R.R. at 284a, N.T. at 113-114; R.R. at 300a-301a, N.T. at 179-181. Further, during Thakkar's direct and cross-examination, Thakkar and Developer's counsel, over BVA's counsel's objections, repeatedly represented to the Board that Heinrich had demanded the Connector Road's specific location on the Township's behalf. *See* R.R. at 274a, N.T. at 75-76 (Thakkar testified: "In order to comply with this requirement, the configuration and the location of the proposed [C]onnector [R]oad would need to change, **which has been determined by the [T]ownship**.") (emphasis added); R.R. at 277a, N.T. at 85 (Thakkar again explained that the site location "is restricted by multiple things: [t]he road, geometry of the property lines, topography, and **most importantly**, **proposed** [C]**onnector** [R]**oad**, **the location of which was determined by the** [T]**ownship** through previous plan approvals. And the location of that [Connector R]oad dictates the design of the site primarily.") (emphasis added); R.R. at 282a, N.T. at 105 (Thakkar emphasized: "One, and most important [of the reasons for the waiver request], is the configuration and the location of the [C]onnector [R]oad as has been requested by the [T]ownship **requires** the [Connector R]oad to come in at [sic] certain location which is shown on the plan.") (emphasis added); R.R. at 282a, N.T. at 107 (Thakkar represented: "The [Connector R]oad cannot have 750-foot radii and still be in the location where it is shown **which was predetermined by the** [T]**ownship** and meet the geometry of the [Connector R]oad.") (emphasis added); R.R. at 283a, N.T. at 109 (Developer's

20

Counsel stated: "Commonwealth Court has found and [the trial court] has found based on testimony and documents that [] **Heinrich set that** [Connector **R**]oad in that location.[10] And I'm not going to get into a debate now about that. That's been

[10] Developer's counsel referred to the trial court's decision in *Condemnation of Fee Simple Title to 0.069 Acres of Vacant Land and Certain Easements Owned by Brandywine Village Associates (UPI#30-5-226) and Condemnation of Fee Simple Title to 1.93 Acres and a Temporary Grading Easement Over 0.26 Acres of Vacant Land Owned by L&R Partnership and John R. Cropper (UPI#30-2-47) for a Public Street*, (Chester Cnty. No. 2014-11237, filed September 8, 2017). Therein, the trial court found:

> [Developer]'s original design called for the Connector Road to follow the access easement and exit onto [Route] 322 at the present signalization. Under this plan, [Developer's] bank pad and parking were entirely outside the BVA's easements, and could be built by right and without Township assistance. [Heinrich] insisted that the location of the bank pad site and Connector Road[] be reversed. [] Heinrich testified that doing so was necessary to maximize the distance between signals along [Route] 322, to avoid an unsafe traffic pattern within the bank parking lot, and to align the Connector Road with the [P]roperty boundary, which is a traffic engineering best practice.

*Condemnation of Fee Simple Title to 0.069 Acres,* slip op. at 27, R.R. at 806a. On appeal, this Court stated:

> Heinrich is a traffic engineer and transportation planner working as the consulting traffic engineer for the Township. He had urged that the Connector Road run entirely parallel to the [Developer]/BVA boundary to align it with a then-proposed road on the other side of Route 322. Heinrich also explained that it was important to shift the Connector Road east in order to maximize the distance between signals along Route 322.
>
> He also testified that [the Pennsylvania Department of Transportation] has no written rule regarding the distance between signals, but the general rule of thumb is to try to achieve a minimum of a thousand foot spacing centerline to centerline between successive signals. He believed that the distance between the existing access easement's egress onto Route 322 and the signal at Bollinger Road, located to the west of the access easement, was approximately 900 feet. However, regardless of the exact distance, he would prefer to place the Connector Road's egress onto Route 322 as far to the east as possible, in order to maximize the distance

21

decided by the courts on at least two different occasions.") (emphasis added); R.R. at 283a, N.T. at 110 (L&R's counsel complained: "Thakkar repeated I believe it's 11 times that the [T]ownship required the location of the [Connector R]oad. So asking about the location of the [Connector R]oad is part of his case." Township Solicitor, Kristen Camp (Solicitor Camp), responded: "I agree it's a fair question. But this witness is not the right person to answer it, so [] Heinrich will be available."); R.R. at 291a, N.T. at 144 (Thakkar stated: "[F]irst of all, this location that we're talking about is planned, . . . this [Connector R]oad has been reviewed and commented for months and years. Configuration of the [Connector R]oad as is has been set in terms of reviews, [Pennsylvania Department of Transportation (DOT)] applications, et cetera."); R.R. at 315a, N.T. at 239 (Thakkar noted: "This particular [Connector R]oad that has been on the books for a very long time, **the location of which was determined by the [T]ownship**.") (emphasis added); R.R. at 320a, N.T. at 258 (Developer's Counsel asserted: "It's over and over and over. **We have said that the [Connector R]oad has been fixed by the [T]ownship**, and that's what we're stuck with. If he wants to argue [on appeal] . . . let him do it. But it's enough of the same thing over and over again.") (emphasis added).

When asked directly on cross-examination who insisted that the Connector Road be constructed at the exact location, Thakkar hedged:

> Q. Who from the [T]ownship told you that the [T]ownship insisted on locating the proposed [C]onnector [R]oad . . . in the exact location as you show it . . . ?

---

between signals. Heinrich also testified that it was a best engineering practice to align roads with property boundaries.

*Brandywine III*, slip op. at 10 (quotation marks omitted). Notably, the plans at issue in that condemnation case differed from the 2018 Plan at issue here. Significantly, the bank pad has been removed from the current 2018 Plan. Further, notwithstanding Developer's counsel's representations, the aforementioned passages do *not* represent court determinations that the Township fixed the Connector Road's specific location on the present 2018 Plan.

A. Well, this plan has evolved through multiple reviews.

Q. That's not what I asked you, sir.

. . . .

A. [] Heinrich has made numerous comments through the history of this project about where this [Connector R]oad needs to be, how it needs to hug the property line, why it needs to be further away from Bollinger Road, et cetera.

Q. So it's your testimony that [] Heinrich is requiring that it will be physically located right there; is that correct?

A. [] Heinrich has made comments --

Q. Yes or no?

A. -- which resulted in that plan.

. . . .

Q. Anyone else, or is it just [Heinrich]?

A. [] Heinrich is primarily the person that took the review of the traffic plan and made comments, extensive comments, about where the [Connector R]oad needs to be and the configuration of the road.

Q. Is there any reason absent what you're now telling us that Heinrich is insisting that it be right there in that location? Is there any reason that from a design standpoint that it couldn't be located somewhere else?

. . . .

[Solicitor Camp]: . . . . Isn't the location of the [C]onnector [R]oad shown in the location on these plans based on what land area the [T]ownship condemned?

THE WITNESS: That is correct, on the back piece.

R.R. at 288a-289a, N.T. at 130-133.

In Thakkar's cross-examination, Appellants' counsel attempted to demonstrate that Developer's need for the requested waivers were simply the result

23

of Developer's desire to locate the Connector Road to maximize the available building area, rather than due to the land's unique qualities.

BVA's counsel called Heinrich as of cross-examination, during which Heinrich testified as follows:

> Q. [Developer's Counsel] . . . insists that **you directed the location of the [C]onnector [R]oad; is that true**?
>
> A. **No**.
>
> Q. **Did you require and insist on the present location of the [C]onnector [R]oad**?
>
> A. **No**.
>
> Q. Did you require and insist on the abandonment of the current controlled entrance from Route 322?
>
> A. Are you referring to the existing driveway to BVA?
>
> Q. Yes, sir. Do you want me to repeat that?
>
> A. Yeah.
>
> Q. Did you require and insist on the abandonment of the current controlled entrance on Route 322?
>
> A. If I understand your question correctly, **no**.

R.R. at 395a, N.T. at 558 (emphasis added). Later, Heinrich testified:

> [Q.] . . . [H]ave you seen any [Board] resolution specifically approving the location of the [C]onnector [R]oad at the existing proposed location?
>
> A. I presume **that's part of the land development application**, **so when the land development is approved**, **the [Connector R]oad will be approved**.
>
> Q. No, I didn't ask you that. I asked you if you have seen any [Board] resolution heretofore, not as part of the approval of this plan, heretofore that says that the [B]oard approves this specific location of the [C]onnector [R]oad? The last question I asked you about correspondence, you

24

talked about [DOT]. Now I'm asking you about an actual [B]oard resolution.

A. I don't understand the distinction.

Q. Have you seen any resolution of the [Board] saying that this [Connector R]oad should be located exactly where it appears?

. . . .

A. I'm not aware of one.

Q. Are you aware of any restrictions on building design on the existing . . . commercial tract . . . that limits or restricts the design of this development plan for the [P]roperty?

A. No.

R.R. at 401a, N.T. at 581-582 (emphasis added).

Q. Do you have any documentary evidence the [T]ownship with this plan required the road to be moved, the existing road to be moved 100 feet east?

A. Required?

Q. Yes.

A. No.

R.R. at 405a, N.T. at 597-598.

The Connector Road's location is the foundation for many of the requested waivers. However, based on Heinrich's testimony, which the Board found credible, it appears that the Township did not *require* the Connector Road's placement at its current location. Appellants rely on several variance cases for the proposition that self-inflicted hardship is not justification for the grant of a variance. *See* Appellants' Br. at 35. However, the burden for a SALDO waiver request is less rigorous than that for a variance and, thus, those cases are inapposite.

25

Nonetheless, Appellants also cite, for persuasive purposes, *Lake MacLeod Homeowners Ass'n, Inc. v. Pine Township Board of Supervisors* (Pa. Cmwlth. No. 1247 C.D. 2017, filed March 12, 2018), wherein this Court reversed a township board of supervisors' grant of a SALDO waiver that had been granted for aesthetic purposes. The waiver for an undeveloped property pertained to requirements that no more than three dwelling units be served by a private street, and that private street rights-of-way may not be less than 50 feet in width. The objectors argued, *inter alia*, that because the applicant was creating a subdivision on two large, undeveloped corn fields, the proposed street width could not have resulted from the property's physical characteristics and, accordingly, the need for a waiver resulted from self-imposed hardship.

In concluding that the board improperly granted the waiver, the *Lake MacLeod* Court explained:

> [I]n light of the fact that, prior to [the a]pplicant's proposed development, the subject property was unimproved, it is unclear why [the a]pplicant could not lay out its private streets in a manner that complies with . . . the SALDO's requirements. As such, the [s]upervisors erred in determining that waivers from the literal enforcement of that provision were necessary to prevent undue hardship based on the peculiar conditions of the subject property.

*Id.*, slip op. at 29. This Court finds *Lake MacLeod* persuasive. In the instant matter, the Property is similarly undeveloped, but for the artificial pond which Thakkar testified could be moved. *See* R.R. at 292a, 322a. Accordingly, like in *Lake MacLeod*, Developer's purported hardship was self-imposed and does not support the undue and/or unnecessary hardship justification for the numerous waiver requests.

26

Nonetheless, this Court must also consider whether the waivers were proper under the standard set forth in *Monroe Meadows*, i.e., "a waiver [is] proper where a development offers a substantial equivalent to a subdivision requirement, where an additional requirement would offer little or no additional benefit, and where literal enforcement of a requirement would frustrate the effect of improvements." *Id*. at 553.

> The law is well established:

> In a land use proceeding, the [B]oard is the ultimate fact-finder and the exclusive arbiter of credibility and evidentiary weight. *Nettleton v. Zoning Bd. of Adjustment of the City of Pittsburgh*, . . . 828 A.2d 1033 ([Pa.] 2003). . . . Moreover, the fact-finder does not capriciously disregard competent evidence by choosing to accept one witness' testimony over another witness' testimony.

*Joseph v. N. Whitehall Twp. Bd. of Supervisors*, 16 A.3d 1209, 1218 (Pa. Cmwlth. 2011). The [B]oard "is the arbiter of credibility and may reject the testimony of an expert witness." *Levin*, 681 A.2d at 863. "As the fact[-]finder, the Board has the power to reject even uncontradicted testimony if the Board finds the testimony to be lacking in credibility." *Heritage Bldg. Grp., Inc. v. Bedminster Twp. Bd. of Supervisors*, 742 A.2d 708, 710 (Pa. Cmwlth. 1999).

With respect to Developer's SALDO waiver requests, the Board described each implicated SALDO section, and Developer's explanation for the waiver request:

> (i) Section 350-13 [of SALDO] which requires the submission of preliminary plans for proposed land development. [Developer] requests a waiver to allow the Plans to be approved as preliminary/final land development plans.

> (ii) Section 350-24.B(2)(a) [of SALDO] which requires a four[-]step design process to be used to the maximum extent feasible for subdivisions or land development

27

where no common open space is to be designated. Because there is no common open space proposed for the development, [Developer] believes that a waiver is appropriate. [Developer] also argues that the layout of the Shopping Center was largely dictated by the layout of the Connector Road and thus completing the four-step process would frustrate the effect of the improvements designed to implement requirements imposed by the Township (the Connector Road.) [R.R. at 277a,] N.T. at [] 85.

(iii) A partial waiver from Section 350-24.B(3)(i) [of SALDO] which requires locations and dimensions of all existing streets, railroads, sewers and sewage systems, aqueducts, water mains and feeder lines, fire hydrants, gas, electric, and oil transmission lines, watercourses, buildings, sources of water supply, easements, areas subject to special deed restrictions, and other significant features within the property or within 300 feet of any part of the property proposed to be developed or subdivided to be depicted on a series of maps submitted with the application. [Developer] requests a partial waiver to not provide all of this information for private properties within 300 feet where [Developer] does not propose any improvements and does not have the right to enter upon those adjacent properties to collect information required by this section. [R.R. at 271a,] N.T. at [] 61. [] Thakkar testified that [Developer] does not have permission to enter private property to gather the necessary information. [R.R. at 271a,] N.T. at [] 61.

(iv) Section 350-24.B(3)(o) [of SALDO] which requires the submission of a shadow analysis showing the location of existing and new trees and screening and shadows cast by proposed structures and mature landscaping at 9:00 a.m[.], noon and 3:00 p.m. on the date of the winter solstice. [Developer] argued that a shadow analysis is not applicable to the Plans and/or in the alternative a waiver is appropriate because the Plans propose one-story buildings that are far removed from any adjacent buildings on adjacent properties and because there are no large trees proposed to be located on [Developer's] Property that would cast a shadow on any building located on adjacent property. According to [] Thakkar, the closest structure from the property line is approximately 60 feet away and

28

the closest structure from the proposed buildings is 200 feet away.  [R.R. at 271a,] N.T. at [] 63.

(v) Section 350-33.B [of SALDO] which requires the minimum centerline radii for horizontal curves to be 750 feet for collector streets.  The Connector Road does not meet this minimum standard.  [] Thakkar testified that a waiver is appropriate because the design of the Connector Road was dictated by the Township, there is limited area available within the [c]ondemned [p]roperty and there are limitations in the design of the Connector Road due to the existing artificial pond and wetlands on the [c]ondemned [p]roperty and proximity of existing Quail Hill Lane.  On cross-examination [] Thakkar expounded upon his rationale for requesting the waiver in response to a question raised by [L&R's counsel, Eugene Orlando (]Orlando[)] on behalf of L&R.  He testified that the rear portion of the proposed Connector Road, as it ties into N. Guthriesville R[oa]d[], has a 255[-]foot radius, and there is no physical way to design the Connector Road with a 750[-]foot radius within the confines of the [c]ondemned [p]roperty and be able to intersect N[orth] Guthriesville Road at a 90° angle.  [R.R. at 298a,] N.T. at [] 170.  [] Thakkar also testified that from a functional point of view the Connector Road serves as a local road because it only serves two properties and that the Connector Road meets the requirement for a 250-foot minimum radius on a local road.  [R.R. at 282a,] N.T. at [] 106-107.

(vi) Section 350-33.C [of SALDO] which requires tangents of at least 100 feet between reverse curves.  [] Thakkar testified that this waiver is appropriate for the same reasons as cited above relevant to the waiver requested for Section 350-33.B [of SALDO].

(vii) Section 350-34.E [of SALDO] requires 'the grade of any street at the approach to an intersection' that exceeds 4% to have a leveling area not greater than 4% grade for a distance of 40 feet measured from the nearest right-of-way line in the intersecting street.  [] Thakkar explained that he does not believe a waiver is necessary from this section of [] SALDO because the driveway leading out of the parking lot to Horseshoe Pike is a driveway and not a street.  [R.R. at 272a,] N.T. at [] 67-68.  However, in the alternative[,] if the Board believes this section is applicable,

29

[Developer] requested a waiver for the right-out only exit from the parking lot to Horseshoe Pike due to available geometry. According to [] Thakkar, the parking lot is 4 to 5 feet lower in grade than the grade of Horseshoe Pike which exacerbates the slope of the driveway thus justifying the waiver. [] Thakkar explained that if you regrade the parking lot to meet the grade of Horseshoe Pike and thus comply with this section of [SALDO], you would cause the grade of the rear driveway to not comply with the maximum slope. [R.R. at 273a,] N.T. at [] 69.

(viii) Section 350-35.D [of SALDO] which requires that streets entering from opposite sides of another street shall either be directly across from each other or offset by at least 200 feet on local and collector streets, measured from centerline to centerline. The intersection of the [c]ollector [r]oad and N[orth] Guthriesville R[oa]d[] is 133 feet from the intersection of Quail Hill Lane and N[orth] Guthriesville R[oa]d. [Developer] requests a waiver from this section and claims that the location and design of the Connector Road was dictated by the Township and that literal enforcement of this requirement would frustrate the effect of the improvements designed to implement other requirements. [] Thakker also testified that the waiver is necessary in order for the Connector Road to intersect N[orth] Guthriesville Road as close to a 90° angle as possible. He also explained that there is limited property area available to reconfigure the Connector Road and the existing pond and wetlands that are located on the [c]ondemned [p]roperty restrict different configurations of the Connector Road at its intersection with N[orth] Guthriesville R[oa]d. [] Thakkar testified that it is not possible to comply with this requirement within the [c]ondemned [p]roperty. [R.R. at 282a,] N. T. at [] 105-106. Finally, because N[orth] Guthriesville R[oa]d[] is a state road, [DOT] will determine if the offset of the Connector Road from Quail Hill Lane is adequate.

(ix) Section 350-36.B [of SALDO] which requires the length of a deceleration lane along Horseshoe Pike, posted at 35 miles-per-hour, to be a minimum of 220 feet. [] Thakkar testified that the [2018] Plan[] provide[s] a right turn lane (as opposed to a deceleration lane) which is 200 feet long at the approach of the signalized intersection at the Connector Road and Horseshoe Pike. [] Thakkar

30

testified that this section is not applicable to a right turn lane (which is provided at a signalized intersection as opposed to a deceleration lane which is proposed at an unsignalized intersection.) In the alternative, [] Thakkar testified that the waiver is warranted because there is limited space available between the proposed Connector Road intersection with Horseshoe Pike and the existing right in, right out driveway to the BVA [p]roperty. [] Thakkar also testified that because Horseshoe Pike is a state road, [DOT] will determine the appropriate length of this lane whether it be a right turn lane or deceleration lane. [R.R. at 285a,] N.T. at [] 117-118.

(x) Section 350-40.C [of SALDO] which requires the grade of a driveway intersecting a street not to exceed 5% within the legal right-of-way or 14 feet from the edge of shoulder, whichever is greater. [Developer] requests a waiver from this requirement to allow the maximum grade for the right -out only driveway from the parking lot onto Horseshoe Pike to be 9.3%. [] Thakkar testified that in order to comply with this requirement, the elevation of the front parking lot and building would have to be raised which in turn would require other areas of the Property to be graded at a steeper slope which would then cause other design standards to not be met, such as the grade of the rear driveway. [R.R. at 272a-273a,] N.T. at [] 68-71. In response to questions asked by [BVA's counsel, Paul Prince (]Prince[)] on cross-examination, [] Thakkar indicated that there is a 2½[-]foot difference in vertical grade between the exit driveway and the parking lot and that if you redesigned the exit driveway to comply with the ordinance section, you would have to raise the parking lot grade to a 10% grade which would not be a safe or desirable slope for a parking lot in a shopping center. [R.R. at 314a,] N.T. at [] 233-[2]34.

(xi) Section 350-40.N(2) [of SALDO] which requires a minimum radius on private driveway entrances to be 30 feet. The modification requested is to allow a 25[-]foot radius on two driveway curves, one coming out of the front entrance from the BVA [p]roperty turning right onto the Connector Road and the second being the rear entrance drive on the BVA [p]roperty turning right onto the Connector Road. All other driveway radii comply with this requirement. [R.R. at 273a,] N.T. at [] 72. []

31

Thakk[a]r testified that the waiver is needed because a 30[-]foot minimum radius cannot be provided without encroaching onto BVA's [p]roperty and without moving the location of the Connector Road. [] Thakkar testified that he did not believe it was possible to move the location of the Connector Road and still fit within the area of the [c]ondemned [p]roperty. [R.R. at 274a,] N.T. at [] 76.

(xii) Section 350-47.B(2) [of SALDO,] which requires that land developments be self-sustaining relative to storage and disposal of sewage and that the applicant shall provide sufficient storage and land area 1½ times the size determined necessary to store disposable treated sewage effluent generated by the uses on the site. [Developer] requested a waiver from the section citing that the Township and the [Municipal] Authority have previously approved a waiver from this requirement and [Pa. DEP] has approved a planning module.

(xiii) Section 350-54.B [of SALDO] which requires the subdivider to plant street trees outside of the street right-of-way spaced 40 to 60 feet apart and staggered along both sides of the street. [Developer] argues that it does not meet the definition of a 'subdivider' as defined in Chapter 300 of the [Township] Code and that because no subdivision is proposed on the [2018] Plan[], this section is not applicable. In the alternative, if the Board finds that this section is applicable and that a waiver is necessary, [Developer] claims that the existing topography, artificial pond, [sic] wetlands, need to comply with stormwater management requirements, and geometry of the Connector Road prohibit the street trees from being located outside of the right-of-way. [R.R. at 277a,] N.T. at [] 86-88.

Board Dec. at 25-29.

Similarly, the Board described each Township Stormwater Ordinance waiver request and Developer's purported justification therefor:

(i) Section 345-311.A(3) [of the Township Stormwater Ordinance,] which specifies that all open channel slopes be no steeper than one foot vertical for every four feet horizontal. [Developer] requests a waiver to provide open channel slopes at one foot vertical for every two feet

32

horizontal.  [] Thakkar testified that this waiver is necessary because there is limited right-of-way available within the [c]ondemned [p]roperty to provide a swale at a four to one slope and still maintain the geometry of the Connector Road. [R.R. at 278a,] N.T. at [] 92. The second location where the proposed slope is two to one is in the area along the southern side of the Connector Road adjacent to the BVA [p]roperty.  [] Thakkar testified that the waiver is necessary in this location in order to reduce the height of a retaining wall which is proposed to be built adjacent to the sidewalk on the southern side of the Connector Road.  [R.R. at 279a,] N.T. at [] 93-95.

(ii) Section 345-311.B(1) [of the Township Stormwater Ordinance,] which requires that storm sewers be placed along the shoulder of the roadway.  [] Thakkar explained in his testimony that the proposed storm water pipe that runs within the bed of N[orth] Guthriesville R[oad] cannot be placed in the shoulder because there are wetlands on the south side of N[orth] Guthriesville Road adjacent to the edge of the road and there is an existing sanitary sewer force main on the north side.  He testified that there is no way to install the storm pipe in the shoulder of the roadway due to the narrow width of the road and these existing pipes.  [R.R. at 283a,] N.T. at [] 111-112.

(iii) Section 345-311.B(2) [of the Township Stormwater Ordinance] which requires the use of either reinforced concrete pipe or corrugated metal pipe for storm sewers with certain minimum pipe diameters and permits the use of high[-]density polyethylene pipe ([]HDPE[]) if installed under manufacturer specifications and with specific permission by the Township engineer.  [Developer] proposes to install two 12[-]inch . . . pipes under the Connector Road.  [] Thakkar testified that as a result of existing grades of the L&R [p]roperty (the land where the stormwater is flowing from) and the limited land area within the Connector Road, the stormwater pipes underneath the Connector Road must be 12 inches in diameter in order to provide as much coverage between the pipe and [the] top of [the] road.  [R.R. at 284a,] N.T. at [] 114.  The reduction in pipe diameter from 15 inches to 12 inches is intended to maximize the depth of the pipe section.  [R.R. at 284a,] N.T. at [] 113-114.  [] Thakkar testified that it is impossible to maintain minimum cover

33

over the proposed twin storm pipes while accommodating the road grades within the Connector Road and still conveying drainage from the L&R [p]arcel across the Connector Road. *Id*. During cross-examination from [] Orlando, [] Thakkar indicated that it was impossible to provide the appropriate grades without extending beyond the [c]ondemned [p]roperty. [R.R. at 301a,] N.T. at [] 181.

(iv) Section 345-311.B(7) [of the Township Stormwater Ordinance,] which requires the curb inlets to be placed at curb tangents and maximum amount of the encroachment of runoff on the roadway pavement to be no more than 4 feet wide during the design storm event. [Developer] is proposing inlets along the curb radii to reduce the spread of flow encroaching on the Connector Road. [] Thakkar testified that in order to keep the spread of flow below the permitted 4 feet, there must be multiple inlets and that because of the number of inlets required to keep the flow below 4 feet, inlets must be placed along the radius of the curb. [R.R. at 281a,] N.T. at [] 102-103. He also argued that this requirement should not apply to inlets installed on Horseshoe Pike which is a Township which is a state road [sic] that must comply with [DOT] standards. [R.R. at 281a,] N.T. at [] 103-104.

(v) Section 345-311.B(10) [of the Township Stormwater Ordinance,] which requires the stormwater system to be designed to produce minimum velocity of 3.0 feet per second ([]fps[]) when flowing full and maximum permissible velocity to be 10 fps with pipe slopes a minimum of 0.5%. [Developer] can meet the minimum pipe slopes of 0.5% but in two locations the velocity of the pipe is slightly in excess of 10 fps (10.93 fps in one section and 10.45 fps in another section). [] Thakkar explained the rationale for this waiver in his testimony on December 12, 2018. *See* [R.R. at 279a-280a,] N.T. [at] 96-100.

(vi) Section 345-311.B(12) [of the Township Stormwater Ordinance] requires all storm pipes to be laid to a minimum depth of one foot from subgrade to the top of pipe. [] Thakkar explained that the storm water pipe that crosses under the proposed Connector Road does not meet this requirement due to the existing topography and the limited amount of right-of-way in the [c]ondemned [p]roperty that is available for grading. According to []

34

Thakkar, the existing topography of the L&R [p]roperty and limited right-of-way within which to grade and install the pipe, the pipe cannot physically be laid a minimum depth of [one] foot from the subgrade to the top of the pipe or crown of the pipe. Based on these restrictions, [Developer] has proposed to install two 12-inch pipes rather than one large pipe. However even with two smaller diameter pipes, [] Thakkar testified that it is not physically possible to lay the pipes a minimum depth of [one] foot from the subgrade to the top of the pipe. [R.R. at 280a-281a,] N.T. at [] 100-101.

(vii) Section 345-311.D(12) [of the Township Stormwater Ordinance,] which requires the discharge as well as the emergency spillway, dam breast areas, or water storage area of a detention basin to be located no closer than 75 feet from the original property line of the parcel being developed or any new property lines that are created. [] Thakkar testified that a waiver is necessary because there are wetlands and an artificial pond on the east side of N[orth] Guthriesville R[oa]d[] where the stormwater is directed to flow which make it physically impossible to provide a 75[-]foot buffer or separation between the lot lines and still comply with stormwater requirements. [R.R. at 278a,] N.T. at [] 89. [] Thakkar testified that it would not be possible to provide a 75[-]foot buffer without relocating the Connector Road. [R.R. at 278a,] N.T. at [] 89-90.

Board Dec. at 29-31.

The Board explained its decision to grant the waivers as follows:

As part of the [2018] Plan[], [Developer] has requested the Board to approve various waivers from SALDO and [the Township S]tormwater [Ordinance] criteria that are set forth in the findings of fact above. These waivers were further outlined in correspondence provided by [Developer's] engineer and [Developer's] counsel. . . . [Developer] adhered to the requirement that all requests for modification shall be in writing and shall accompany and be a part of the application for development. [Developer']s written request for waivers from both [] SALDO and [the Township] Stormwater Ordinance stated in full the grounds and facts of unreasonableness or

35

hardship on which the request is based, the provision or provisions of the ordinance involved and the minimum modification necessary.

The Board finds that [Developer] has provided sufficient legal basis for the grant of the various waivers from [] SALDO and [the Township] Stormwater Ordinance. The Board finds that [Developer's] expert civil engineer, [] **Thakkar**, **presented credible testimony that explained the circumstances that warranted the need for the various waivers**. The Township consultants, [] Cline and [] Heinrich, reviewed the waiver requests and stated no objection and in fact testified that in certain circumstances, a waiver was appropriate. Neither [] Cline nor [] Heinrich presented any objections to the waivers requested by [Developer] in the [2018] Plan[]. The Planning Commission supported the requests for the waivers and had no objection to the Board approving the same.

[Appellants] disagree that [Developer] met its burden of proof to be entitled to the various waivers and urge the Board to deny the waivers. L&R presented written documents and reports prepared by LTL which opine[d] that the waivers are not necessary and that a shopping center can be designed on the [] Property and the [c]ondemned [p]roperty without the need for waivers. L&R presented the testimony of [] Ulrich, an expert civil engineer who prepared the LTL Alternat[e] Plan . . . . BVA and L&R argued that the LTL Alternate Plan demonstrates that [Developer] is not entitled to the waivers because a shopping center and [C]onnector [R]oad can be designed on the [] Property without the need for waivers.

The Board does not find that the LTL Alternate Plan demonstrates that [Developer] is not entitled to the waivers. [Developer] argues: 'The issue of whether a substantially different development, a different design of the [C]onnector [R]oad and associated stormwater basin, could be constructed on the [Property] without the necessity for some of the SALDO waivers and modifications sought, is irrelevant to the issues involved in the [Application.]' [Developer]'s Memorandum of Law at [] 25. The Board agrees. The Board rejects [Appellants'] argument that the LTL Alternate Plan is

36

relevant and proves that [Developer] has not met its burden of proof to be entitled to waivers.

Board Dec. at 81-83 (emphasis added). After reviewing the record evidence, this Court agrees that Thakkar's aforementioned testimony, which the Board found credible, provided a sufficient factual basis to support the Board's determination under the *Monroe Meadows* standard. Accordingly, the Board properly granted the waivers.

### C. <u>Lack of Substantial Evidence and Capricious Disregard</u>

Appellants argue that the Board mischaracterized and capriciously disregarded Ulrich's testimony and the data comprising his Alternate Plan, which demonstrated that there is no hardship; that applying SALDO provisions is not unreasonable; that compliance therewith does not cause unnecessary hardship; and that the evidence shows Developer's 2018 Plan is contrary to the public interest. First, Appellants contend that the Board wrongly concluded that Ulrich's testimony regarding the possibility of constructing an alternate design, and Ulrich's Alternate Plan, were not relevant to the issues involved in Developer's application. While this Court agrees with Appellants that the feasibility of an Alternate Plan requiring fewer waivers is relevant to the issue of undue hardship under Section 512.1 of the MPC, the MPC's express *undue hardship* standard, it is not relevant in the application of the *Monroe Meadows* standard. Under the *Monroe Meadows* standard, "a waiver [is] proper where a development offers a substantial equivalent to a subdivision requirement, where an additional requirement would offer little or no additional benefit, and where literal enforcement of a requirement would frustrate the effect of improvements." *Monroe Meadows*, 926 A.2d at 553. Thus, that standard considers the submitted application in the context of the SALDO's requirements, the effect of the 2018 Plan on those requirements, and the impact that the requirements would

37

have on the 2018 Plan.  Accordingly, under the *Monroe Meadows* analysis, Ulrich's testimony and the Alternate Plan were not relevant to the Board's consideration of the application, and the Board did not capriciously disregard Ulrich's testimony and the Alternate Plan.

Appellants further claim that the Board's decision is not supported by substantial evidence.  Appellants point to alleged misstatements and inconsistencies in the testimony of Thakkar, Heinrich, and Cline.  *See* Appellants' Br. at 40-44.  However,

> [claims of inconsistent or conflicting testimony] challenge[] the <u>weight</u>, and not the sufficiency, of the evidence. *See Commonwealth v. DeJesus*, . . . 860 A.2d 102, 107 ([Pa.] 2004) (noting that questions concerning inconsistent testimony go to the credibility of the witness, and hence, implicate the weight, rather than sufficiency of the evidence).

*Commonwealth v. Montalvo*, 956 A.2d 926, 932 n.6 (Pa. 2008) (emphasis added).  "The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses."  *Commonwealth v. Davido*, 868 A.2d 431, 442 n.18 (Pa. 2005).  This Court may not reweigh the evidence.  Accordingly, Appellants' argument is without merit.

## D. <u>Memorandum of Understanding</u>

Appellants next argue that the Township's obligations under the MOU are the hidden force driving the Board's approval of Developer's 2018 Plan, given Developer's need for 19 waivers.  According to Appellants, absent the Board's responsibilities under the MOU, the Board could simply require Developer to reduce the size of its proposed building by 8.15%, which would allow the Connector Road location to be moved and the need for waivers eliminated.  Despite the Board's

insistence that the MOU does not require it to approve the 2018 Plan, Appellants assert that the Board's erroneous approval of Developer's three prior plans, along with the 2018 Plan's approval requiring numerous waivers, demonstrates otherwise.

The MOU states, in relevant part:

B. Developer intends to improve [Developer's] Property as a mixed-use commercial development (the []Project[]).

. . . .

F. In order to support existing volumes of traffic and traffic projected to be generated by new growth and development in the Township, the Township has an interest in creating a new public road connecting Horseshoe Pike to North Guthriesville Road [].

. . . .

H. In order to construct the Connector Road, a portion of [Developer's] Property would need to be used for the right-of-way and the construction of the Connector Road and related improvements.

I. In addition, in order to construct the Connector Road and storm water management facilities necessary for the Connector Road, a portion of the L&R [p]roperty . . . and right-of-way over a small area of the [BVA] [p]roperty adjacent to Horseshoe Pike . . . would need to be acquired. . . .

J. Further, the [e]asements are located in areas on [Developer's] Property where the Connector Road is proposed and will need to be modified or extinguished in order to construct the Connector Road.

K. The Connector Road is intended as a public road for use by the general public and is not necessary for the development of [Developer's] Property. The Township has made an independent judgment that the Connector Road is in the public interest and for a public purpose.

L. The Township has informed Developer that the Township would like the Connector Road constructed by Developer in connection with development of the Project.

39

. . . .

O. As a result of Developer's inability to acquire the [necessary property] and extinguish the [e]asements by negotiation, the Township intends to exercise its power of eminent domain to acquire the [necessary property] and terminate the [e]asements as necessary to construct the Connector Road.

. . . .

NOW THEREFORE, in consideration of the facts set forth . . . , the parties hereto, intending to be legally bound hereby, agree as follows:

**Agreements**

1. The Township hereby agrees to use its condemnation authority to acquire the [necessary property], and modification or extinguishment of the [e]asements . . . .

2. *In the event the Project receives final land development approval and all necessary permits*, Developer will, at its sole expense, design, permit and construct the Connector Road in conjunction with the Project in accordance with Township and [DOT] requirements, and when completed, dedicate the Connector Road, the associated right-of-way and all related facilities and improvements to the Township, at no cost to the Township and prior to the issuance of the first certificate of occupancy for a building on [Developer's] Property.

3. If the Connector Road is constructed and dedicated as set forth in paragraph 2 above, Developer will be entitled to a credit in the amount of $1,705,000[.00] against the $1,795,000[.00] impact fee for the cost of construction of the Connector Road and the value of the portion of [Developer's] Property used for the Connector Road. Therefore, at the time of the issuance of the first building permit for the Project, the Developer shall pay to the Township the $90,000[.00] balance of the [t]raffic [i]mpact [f]ee.

. . . .

8. After the Township files the necessary Declarations of Taking to condemn the [necessary property,] Developer shall submit to the Township an application for preliminary/final land development approval for the Project ([]Preliminary/Final Plans[]). The Preliminary/Final Plans shall be in substantial conformity with the [plans] approved by the Board on August 7, 2011, with the exception of modifications necessary to bring the Project into compliance with Section 350-34.E of [] SALDO.

R.R. at 471a-478a (italic emphasis added).

The MOU's terms did not purport to, and, as Appellants' emphasize, could not, require the Board's approval of the 2018 Plan.[11] Rather, **if** the Board granted the development plan approval, the MOU required, *inter alia*, the Township to grant Developer an impact fee credit in exchange for Developer's construction of the Connector Road.

The Board explained in its Decision:

[Appellants] argue that the MOU is not operative and does not obligate the Board to approve the [2018] Plan[]. While the Board does believe that the MOU is a valid contract, it does not agree that such document requires the Board to approve the [2018] Plan[]. **The Board's decision to approve the [2018] Plan[] is not due to an alleged legal obligation to do so in the MOU**. Instead, the Board's decision to approve the [2018] Plan[] is as a result of a thorough review of the relevant [o]rdinances and conclusion that the [2018] Plan[] meet[s] all relevant [o]rdinances, except where waivers were requested and appropriately granted.

Board Dec. at 66 (emphasis added).

---

[11] *See Carlino v. Whitpain Inv'rs*, 453 A.2d 1385 (Pa. 1982); *see also Takacs v. Indian Lake Borough Zoning Hearing Bd.*, 11 A.3d 587, 595 (Pa. Cmwlth. 2010) ("Individuals cannot, by contract, abridge the police powers that protect the general welfare and public interest; in other words, where the rights of individuals under a contract are in conflict with the general well-being of the public, the rights of the individual must give way to the general welfare.").

41

Whether the Township is obligated to afford Developer an impact fee credit if Developer's 2018 Plan is approved is a matter separate and distinct from Appellants' assertion that the MOU illegally required the Board to approve the 2018 Plan. Given that substantial evidence supports the Board's 2018 Plan approval, Appellants' argument fails.

## E. The Board's June 19, 2019 Decision

Appellants next protest the validity of the Board's June 19, 2019 Decision. On April 26, 2019, the parties agreed to the Township's request to issue its decision on June 6, 2019. On June 6, 2019, the Board issued its Approval Order granting preliminary and final plan approval. The 13-page Approval Order was mailed on June 7, 2019, and did not contain findings of fact or conclusions of law. On June 18, 2019, Appellants appealed from the Approval Order to the trial court. On June 19, 2019, Solicitor Camp mailed to all parties the Board's 96-page Decision, containing findings of fact, conclusions of law, and a discussion section. The Decision also included the Approval Order at pages 84-96, therein.

Appellants contend that once they appealed from the Approval Order on June 18, 2019, the Board was without jurisdiction to issue the Decision. They distinguish *Bishop Nursing Home, Inc. v. Zoning Hearing Board of Middletown Township*, 638 A.2d 383 (Pa. Cmwlth. 1994), upon which the trial court relied. In *Bishop*, the board denied a property owner's variance request and notified the property owner. After the property owner appealed, the board issued its final decision containing findings of fact and conclusions of law. The property owner complained on appeal to this Court that the trial court should have stricken the board's findings of fact, since they did not accompany the board's decision and were filed after the property owner had appealed from the board's decision.

42

The *Bishop* Court explained:

When a zoning board denies an application, its decision must be accompanied by findings of fact, conclusions, and reasons. [*See*] Section 908(9) of the [MPC], 53 P.S. § 10908(9). Further, if the record in a land use appeal does not include findings of fact, the court shall make its own findings based on the record and any additional evidence presented by the parties. Section 1005-A of the [MPC], 53 P.S. § 11005-A.[12] In *Snyder v. York City Zoning Hearing Board*, . . . 539 A.2d 915 ([Pa. Cmwlth.] 1988), this Court noted that it does not condone the late filing of findings of fact, but did not remand the matter for new findings because careful scrutiny of the record indicated that the landowners suffered no prejudice due to the late filing.

In the matter sub judice, the [b]oard's findings were clearly part of the record before the trial court and it would have been absurd for the court to remand the matter to the [b]oard for lack of findings of fact and conclusions of law. Further, the trial court did not err by refusing to make its own findings since Section 1005-A of the [MPC] authorizes it to make findings only when a board's findings are not in the record. Moreover, careful review of the record demonstrates that [the appellant] was not prejudiced by any 'late filing' of the [b]oard's decision as it had already appealed to the trial court and was permitted to supplement its land use appeal in order to specifically challenge the [b]oard's findings before the trial court.

*Bishop*, 638 A.2d at 386.

Appellants distinguish *Bishop*, noting that the Court, therein, decided the case pursuant to Article IX of the MPC, while the instant matter is governed by Article V of the MPC. Article IX of the MPC requires a zoning board or hearing officer to issue findings of fact which, in *Bishop*, the board did not issue with its decision. *See* Section 908.1(9) of the MPC, 53 P.S. § 10908.1(9).[13] According to

_____

[12] Added by Section 101 of the Act of December 21, 1988, P.L. 1329.
[13] Added by Section 85 of the Act of December 21, 1988, P.L. 1329.

43

Appellants, Article V of the MPC contains no such requirement; therefore, the Approval Order was a complete, appealable decision when it was issued, and the Board was divested of jurisdiction to issue the Decision once Appellants appealed to the trial court.

Notably, in *Snyder*, upon which the *Bishop* Court relied, the appellants argued that "the [b]oard, without obtaining prior approval, incorrectly filed supplemental findings of fact and conclusions of law after the record had been produced by certiorari to the trial court." *Snyder*, 539 A.2d at 916. The *Snyder* Court rejected the appellants' argument, explaining:

> [T]he [b]oard did not commit error in submitting its [s]upplemental [f]indings of [f]act and [c]onclusions of [l]aw after the record had been produced by certiorari to the trial court. This Court does not condone the late filing of supplemental findings of fact as has been done in the instant case. However, our careful scrutiny of the record indicates that no prejudice was done to the appellants in the instant matter by this practice.

*Snyder*, 539 A.2d at 917. The *Snyder* Court did not find that the board's decision, from which the appeal had been taken, was not an appealable order even though it lacked required findings of fact and conclusions of law. Nonetheless, it permitted the board's late filing of its findings of fact and conclusions of law despite that the appeal had already been taken. Regardless of whether Article IX of the MPC requires factual findings and legal conclusions to accompany a board decision, this Court still found no error in the board's late filing and, thus, Appellants' argument is inconsistent with this Court's precedent.

Here, as the trial court recognized in its Opinion Pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 1925(a) (Rule 1925(a) Opinion), "[t]he [Decision] set forth the findings of fact and conclusions of law that support the 'Order.'" Rule 1925(a) Op. at 1-2. The Decision contained the same terms as

those in the Approval Order, and thus, imposed no additional obligations on the parties, but simply added findings of fact and conclusions of law, in explanation of the Approval Order that had been issued. Thus, there is no prejudice to Appellants. This Court agrees with the trial court that "the [Approval O]rder and the subsequently issued findings and conclusions comprised a single decision." Rule 1925(a) Op. at 2. Accordingly, this Court concludes that the Board did not err when it issued its June 19, 2019 Decision, and the trial court properly refused to strike it.

## F. Bias

Finally, Appellants argue that the Board violated their due process rights to a fair hearing because, as owner of the condemned portions of the planned Connector Road, the Board could not act as an impartial adjudicator when it considered the 2018 Plan's approval.

The law is well established:

> A fair trial conducted in a fair tribunal is a basic and fundamental requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. Courts have recognized that 'the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation' of due process. *Kuszyk v. Zoning Hearing B[d.] of Amity T[wp.]*, 834 A.2d 661, 665 (Pa. Cmwlth. 2003)[.] A question of due process reasonably involves an inquiry into the nature of the process actually provided.

*HYK Constr. Co. v. Bd. of Supervisors of Smithfield Twp.*, 8 A.3d 1009, 1018 (Pa. Cmwlth. 2010) (citations omitted).

Section 399-47.N of the Zoning Ordinance provides, in relevant part:

> The tract of land to be developed shall be in one ownership, or shall be the subject of an application filed jointly by the owners of the entire tract, and shall be under unified control. If ownership of the entire tract is held by

45

more than one person or entity, the application shall identify and be filed on behalf of all the said owners.

Board Dec. at 78 (quoting Zoning Ordinance Section 399-47.N).

Appellants assert that, to satisfy Section 399-47.N of the Zoning Ordinance, the Board, in a December 7, 2018 letter signed by the Board's Chairman, acknowledged that "at its public meeting on December 6, 2018, the Board [] adopted a motion consenting to the filing of the [2018] Plan and authorizing [Developer] to pursue approval of the [2018] Plan and the [i]mprovements located on the Township [p]arcels."[14] R.R. at 550a. Appellants contend that the Board thereby acknowledged it was a *joint applicant/joint owner*, and as such, it was improper for the Board to review the 2018 Plan in an adjudicative capacity.

Appellants requested the Board's recusal, but the Board refused. In its Decision, the Board explained:

> [The December 7, 2018] correspondence served the limited purpose of indicating the Township's consent to the filing of the [2018] Plan[] because improvements, primarily a future public road and related improvements, are shown on the [2018] Plan[] which are located on the [c]ondemned [p]roperty, which is owned by the Township. As explicitly stated therein, [the correspondence] does not obligate the Board to approve or disapprove the [2018] Plan[]; it does not obligate the Board to any action relative to the [2018] Plan[]. The [2018] Plan[] w[as] reviewed to determine compliance with Township ordinances; the Board's decision on ordinance compliance is not affected by the ownership of the property or the Board's consent to the filing of the [2018] Plan[].
>
> As in its argument on abandonment of the purpose of the condemnation, [Appellants'] counsel contends recusal is warranted because the Township's consent to the filing of the [a]pplication is in furtherance of a private

---

[14] The December 7, 2018 letter also expressly stated: "This authorization does not imply approval of or approve the [2018] Plan, or the design and construction of the [i]mprovements depicted on the Township [p]arcels." R.R. at 550a.

46

development. Once again, this issue has been decided by the courts. **The Township condemned the subject parcels for a public purpose - a public road and related improvements**. The sanitary sewer line and stormwater pipes on the [c]ondemned [p]roperty serve a public purpose. Even if those facilities serve a private purpose, it is merely incidental to the public purpose. **The Township has not joined in a private enterprise by its consent to the Application**.

Moreover, even if there were facts warranting recusal of the entire Board, the Board must still hear and decide the case. In accordance with Section 909.1(b)(2) of the MPC, [53 P.S. § 10909.1(b)(2),[15]] the governing body, in this case, the Board, has exclusive jurisdiction to hear and render final adjudications on applications for subdivisions and land developments. No other tribunal is given such authority. There is no provision to appoint an alternative tribunal, or ask the Pennsylvania Attorney General to intervene, as suggested by BVA's counsel.

Board Dec. at 70-71 (emphasis added).

As the Board reasoned, the Township-owned property was condemned for a public purpose, i.e., the Connector Road. Neither the fact that Developer's 2018 Plan includes the public Connector Road construction in exchange for an impact fee credit, nor the Board's consent to the 2018 Plan filing, transforms the Township into an applicant for which the Board's recusal would likely be appropriate.[16]

---

[15] Added by Section 87 of the Act of December 21, 1988, P.L. 1329.

[16] The Board also stated in its Decision that, even assuming that recusal of the entire Board was appropriate, it would need to decide the matter pursuant to the Rule of Necessity. *See* Board Dec. at 71.

> [T]he rule of necessity prevents recusal of all members of an agency because **an agency is either statutorily or constitutionally bound to carry out its duties**. *Stroudsburg Area Sch. Dist. v. Kelly*, 701 A.2d 1000, 1003 (Pa. Cmwlth. 1997)[.] The rule of necessity originates from a common law principle that provides that 'when all members of a tribunal or so many that there is not a quorum are subject to recusal, the tribunal must consider the case despite the

Further, Appellants' examples of alleged Township misconduct evidencing purported bias are unconvincing. The hearings were contentious and it is evident that the patience of the Board members, counsel and Solicitor Camp were tested. Although there were instances during the hearings that the Board denied Appellants' objections, and occasions where Solicitor Camp advised the Board contrary to Appellants' positions, there are also numerous instances where Solicitor Camp voiced approval for Appellants' positions. For example, Solicitor Camp agreed with Appellants' counsel that witness questions pertaining to the Connector Road location were appropriate. *See* R.R. at 283a, 289a, 296a. Solicitor Camp also agreed with Appellants' counsel that a question about whether the man-made pond could be moved was relevant. *See* R.R. at 292a. After a thorough review of the lengthy record, in its totality, while observing a concerning lack of professional decorum on all counsel's part, this Court discerns no Board bias. Accordingly, Appellants' arguments fail.

For all of the above reasons, the trial court's decision is affirmed.

_____
ANNE E. COVEY, Judge

---

personal interest or bias of its members, because **otherwise the agency could not carry out its duties and the litigants would be denied a decision in the matter**.' *Id.* The [agency], therefore, is required to consider a case even if all of its members are subject to recusal because it is bound to carry out its duties regardless.

*Henderson v. Unemployment Comp. Bd. of Rev.*, 77 A.3d 699, 717 (Pa. Cmwlth. 2013) (emphasis added).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Brandywine Village Associates, LP     :
and L&R Partnership, LLC,             :
                    Appellants        :
                                      :
            v.                        :
                                      :
East Brandywine Township Board of     :
Supervisors and Carlino East          :     No. 499 C.D. 2020
Brandywine, L.P.                      :

O R D E R

AND NOW, this 20th day of July, 2021, the Chester County Common Pleas Court's April 16, 2020 order is affirmed.

_____
ANNE E. COVEY, Judge